[EDITOR'S NOTE: This case is unpublished as indicated by the issuing court.] MEMORANDUM OF DECISION
This is an action for dissolution of marriage and other relief brought to the judicial district of Waterbury. Many of the facts that give rise to this action are not in dispute. The plaintiff whose maiden name is Margaret Mahaney and the defendant were married on April 18, 1988, in Boulder, Colorado. The plaintiff has resided continuously in the state of Connecticut for at least one year immediately prior to the date the complaint was filed. The marriage between the parties has broken down irretrievably without any reasonable prospects of reconciliation. There are three minor children issue of the marriage, Amy Marie Errichetti born November 14, 1988, Christopher John Errichetti born September 30, 1991, and Daniel Errichetti born July 16, 1994. The plaintiff does not have any other minor children who were born after the date of marriage of the parties. Neither party has received state assistance.
From the evidence, presented, the court finds that the defendant is at fault for the breakdown of the marriage.
The plaintiff was born on June 5, 1958. The plaintiff was a teacher in the Waterbury school system until approximately 1988. The defendant had encouraged her to stop working as a school teacher.
The plaintiff's financial affidavit dated December 6, 2000, shows in Schedule B liabilities totaling $76,398.51. The court makes the following corrections to those liabilities. The present balance due to Dr. Gottlieb is $4,350. This is for orthodontic work for the minor child, Christopher John Errichetti. The balance due to Attorney Michael Conway is covered by the stipulation entered into by the parties. The bill to Dr. Kharma has been paid. Part of the Mazda $400 bill is duplicated on the Visa bill. The Visa bill has been paid. The bill to Costco has been paid. The bill to American Express is slightly higher than shown on her affidavit.
The plaintiff owns a 1999 Dodge Durango with a fair market value of $20,000 and no loan balance. She also owns a 1990 Jeep Wrangler with a fair market value of $2,500 and no loan balance. She owns household furniture and furnishings and miscellaneous personal property with a total value of $5,000. She had a Naugatuck Savings Bank checking account with an approximate $500 balance and a Federated Money Market Account with a $219.93 balance. She owns stocks and bonds and mutual funds through Linsco/Private Ledger Financial Services Mutual Fund with a value of $40,124.95. She owns a State of Connecticut Teacher's Retirement System Plan with a present total value of $41,939.71. She has a 25% interest in an irrevocable trust for property located at Cape Cod, Massachusetts with her 25% interest having a value of $107,500. She has CT Page 10306 an interest in a trust for the family home that originally gave her a thirty year use. That trust was established on December 4, 1997 and the fair market value of her remaining interest is $227,080.
The following items to Schedule A of her financial affidavit reflect expenses that relate to the children:
Description Weekly Amount
School Supplies $20
School Uniforms/Shoes $20
Sports/Lessons $65
Clarinet Lessons/Rental $15
Horseback Lessons $100
Tutor $40
 Tuition $407 (send minor child to parochial school)
Haircuts $12
Summer Camp $58
The plaintiff's financial affidavit also shows a liability to the IRS in the amount of $26,132 for the calendar year 2000. The parties have stipulated that all sums of money received by the plaintiff are not intended to be alimony and therefore she would not have that tax liability.
The defendant was born on December 26, 1956. The defendant has been licensed to practice law in Connecticut since 1985. He holds a B.S. from Columbia University that he received in 1978, and a law degree from the University of Connecticut that he received in 1985. The defendant has been a real estate developer since the early 1970's.
The defendant owns a home in Wilmington, Vermont with a fair market value of $90,000 and no mortgage. He owns a 1996 Jimmy motor vehicle with a fair market value of $11,530 and no loan balance. He has household furnishings of a nominal value. He has a Fleet checking account with a CT Page 10307 balance of $4,742 and Fleet savings account with a balance of $540, a Federated Money Trust. with a value of $1,163, a money market account with a balance of $817. He owns E-Trade stocks with a value of $29,615 and cash of $5,740. He has Pershing stocks with a value of $68,215 and a Schwab account with a value of $11,658. He has life insurance in the face amount of $500,000. He has an IRA with Equitable with a value of $31,566.
The parties are in dispute as to whether the interest that the defendant obtained in Value Health Care was solely for his own benefit or whether it was equally for his benefit and the benefit of his brother. The court finds the following facts regarding the defendant's investment into Value Health Care.
The business of Value Health Care was the sale and distribution of drugs to the residents of various nursing homes. The defendant initially invested $30,000 of his own funds into Value Health Care when the corporation was formed in 1994 or 1995. He claims that he held 50% of his interest for his brother based on his brother's silent interest in Value Health Care since 1995. He further claims that his brother reimbursed him one-half of the funds that he, the defendant, invested into Value Health Care. The defendant in his post-trial brief dated February 14, 2001, makes the following arguments in part in support of his claim that one-half of the interest that he held in Value Health Care was held on behalf of his brother:
 The defendant submits that the evidence establishes that his brother has a fifty percent interest in the proceeds received as a result of the sale of the Value Health, and that such interests continue into the assets in which the funds were invested. The properties affected by this relationship are Watertown ALSA, Knotter, Country Club Estates, Waterbury Terraces and Phoenix Land. The evidence in support of the "partnership" between the brothers derives from the defendant's testimony and several documents placed into evidence.
 The initial investment in Value Health was made in 1994. The amount was to be a $30,000 loan toward the purchase of the property that became the warehouse for the business. That property was 835 West Queen Street, which appears on the defendant's affidavit and is on the valuation stipulation identified as Court Exhibit 2. The first outlay of funds was in the amount of $13,400, which was advanced by the defendant: his brother later repaid him $6,700. Through the next year (1995) additional funds are invested by the defendant, CT Page 10308 which included the advancement of funds on his brother's behalf. In September 1995, the defendant's brother reimbursed him in the amount of $11,500.
 Beginning in late-1995, the defendant began distributing proceeds being paid out by Value Health as dividends or interest on the initial loan to his brother. Evidence of these distributions appears first in Defendant's Exhibit 66, being a copy of a check in the amount of $1930 paid in December 1995. Further evidence appears in Defendant's Exhibit 66, being a copy of a check in the amount of $1930 paid in December 1995. Further evidence appears in Defendant's Exhibits 48 through 65, which are the distribution memos and related checks provided by the defendant to his brother.
 The distribution memos support for the defendant's claim that the interests he held in Value Health were not solely his. This appears, first, in the fact that he was providing the memos at all and not simply giving the funds to his brother as if they were a loan or a gift: if the defendant had simply been giving the funds away to his brother there would be no need for any accounting statement. Second, there is the fact that there is a consistent withholding of sums for tax payment obligations (the "tax reserve" notation on each memo), identifying that the defendant's brother was sharing that burden. Finally, there are the various "footnotes" on several of the memos explaining the calculations made or conveying some information about the identity of the funds. See, Defendant's Exhibits 50 and 54.
The court is not persuaded by that argument.
This court finds for a number of reasons that the defendant did not hold one-half of his interest in Value Health Care for his brother. Those reasons are as follows:
1. Other than for the defendant's testimony there was no documentary evidence such as canceled checks from his brother to substantiate his claim that his brother paid him any amount of money for one-half of the defendant's interest in Value Health Care. The court finds that the defendant's testimony regarding payments from his brother is not credible.
2. The court finds that the defendant's testimony regarding his brother's one-half interest in Value Health Care was not credible. The court does find that the funds the defendant obtained from the sale of CT Page 10309 his interest in Value Health Care were used to purchase his present investments in Watertown ALSA, LLC, Waterbury Terraces, LLC, Phoenix Land, LLC, Country Club Estates, LLC, and Knotter, LLC. The interest of the defendant in these five entities is discussed in more detail later in this decision. He claims that since the funds for those five investments came from Value Health Care and since his brother owned a silent one-half interest in his, the defendant's, share of Value Health Care that his brother therefore has a one-half interest in Watertown ALSA, LLC, Waterbury Terraces, LLC, Phoenix Land, LLC, Country Club Estates, LLC, and Knotter, LLC. The defendant testified on January 3, 2000, in a pendente lite hearing regarding his 43% interest in Phoenix Land, LLC, and what persons, if any, shared in that 43% interest. In that pendente lite hearing he testified that his father and his brother had an equity in his 43% interest in Phoenix Land, LLC, partnership. He further testified that there was a general agreement that his 43% interest would be split three ways. He now claims that his 43% interest is split equally between himself and his brother. In response to the question of "What happened between January 3, 2000, when you testified that your 43 percent interest was being held equally between yourself, your father, and your brother, and the present time, when you've testified that the 43 percent interest is being held by you equally for you and your brother, what's happened between January 3, 2000 and the present time to change that testimony or the holding, whose interest is being held for who?" The defendant responded as follows:
 "Nothing has happened other than my thinking has become clear, Your Honor. I think what I was trying to say back in January was my father had a hope to get a third of my interest, that he had hoped that my interest was really three ways. But, you know, after thinking about it, you know, more carefully, there's no way I can represent that he has a valid expectancy for one-third of that interest."
The court finds that the defendant's explanation as to why his testimony changed between the pendente lite hearing of January 3, 2000, when he testified that his 43% interest was being held equally on behalf of himself, his father and his brother and his present testimony that that 43% interest is now being held solely for himself and his brother was not credible on January 3, 2000, and is not credible at the present time.
3. The defendant prepared a balance sheet as of November 12, 1996, for various selected assets. His interest in the Value Health Care asset was stated as $2,100,000. That balance sheet did not show any of his interest CT Page 10310 in Value Health Care as being held for his brother.
4. The method by which the defendant filed his income tax returns regarding Value Health Care state that all of the income from the 43% interest was his and does not reflect that he was holding a one-half interest for his brother. The parties filed a joint income tax return for the calendar year 1997. Statement nine on that tax return that is a supplement to schedule D showed a gain on the sale of Value Health Care Service, Inc. of $2,186,495. Statement five that was a supplement to schedule B showed a pass through interest income of $17,207. Statement fifteen shows an ordinary loss pass through on the Value Health Care Service, Inc., K1 of $167,383. The 1997 income tax return does not reflect any portion of the income or losses as being attributable to the defendant's brother. If the defendant was holding his interest in Value Health Care in part for his brother the $17,207 would have had another line showing that part of it was being distributed out to his brother. The defendant should then have issued a 1099 interest statement to his brother so that it puts the Internal Revenue Service on notice of the portion that did not belong to the defendant but belonged to his brother. The manner of treating the $167,383 if that sum was in part to be distributed to the defendant's brother would have been for the defendant to issue a letter form to his brother telling his brother the amount of the loss that was being passed through as well as the appropriate basis so that his brother would be able to show on his brother's personal tax return the portion that his brother could deduct. The two alternate ways of treating the $167,383 loss would have been either to show it on a schedule E or supplement to schedule E to show that half of the $167,383 was being passed through to the defendant's brother.
5. The defendant's 1997 Income Tax Return reflected an interest in Knotter, LLC. The return does not reflect that the defendant was holding an interest in Knotter, LLC in part on behalf of his brother. The defendant's 1997 Income Tax Return also refers to the defendant's interest in Watertown ALSA, LLC. The return does not reflect that the defendant is holding an interest in Watertown ALSA, LLC, on behalf of his brother.
6. The income tax returns filed by the plaintiff and defendant parties for the calendar year 1997 and 1998 do not reflect the defendant's brother as having any interest in Waterbury Terrace, LLC, Phoenix Land, LLC, Country Estates, LLC, and Knotter, LLC.
7. When Value Health Care made substantial distributions the defendant retained all of the proceeds and did not turn any of the proceeds over to CT Page 10311 his brother.
8. Neither the defendant or his brother have filed amended income tax returns to reflect his brother's alleged one half interest in Value Health Care. The defendant's accountant and his brother's accountant were aware over one year ago of the claim of the defendant that the defendant was allegedly holding one-half of his interest in Value Health Care for his brother.
9. The defendant's brother did not claim on his 1997 individual income tax return any part of the $2,186,495 gain from the sale of Value Health Care or the $17,207 interest income or the $167,383 loss regarding Value Health Care.
For all of these reasons both individually and collectively, the Court finds that the defendant did not hold any interest in Value Health Care on behalf of his brother and that therefore the investment made from the funds received from the sale of his interest in Value Health Care that was invested into Watertown ALSA, LLC; Waterbury Terrace, LLC; Phoenix Land, LLC; Country Estates, LLC; and Knotter, LLC are all held by the defendant for himself and he is not holding any part of his interest in these entities on behalf of this brother. The defendant's interest in these five entities are part of the general category of Real Estate Interests. The defendant also owns other assets under the general categories of Nursing Home Interests, Real Estate Interests, and Other Interests. These various categories will be discussed seriatim.
I. Nursing Home Interests
The nursing home interests consist of the following:
A. Abbott Terrace
B. Glastonbury Health Care
C. Litchfield Woods (Highland View)
D. Barnett Multi-Health a/k/a Northbridge
E. Sherwood Woods
F. Wadsworth Glen
 A. ABBOTT TERRACE CT Page 10312
The gross fair market value of this asset is $16,300,000 and its net equity is $7,539,353. The defendant has a 13% of a 30% interest in this asset through his holding in JMJ Trust amounting to $294,035 together with a 16.7% interest in Abbott Street, Inc. which has a 1% interest in the home amounting to $12,591 for a total interest in this asset of $306,626. For the fiscal year ending September 30, 2001, Abbott Terrace has total budgeted cash distributions of $750,000. of the $750,000, 30% or $225,000 is budgeted to be distributed to JMJ Trust. The defendant's 13% interest in that total distribution amounts to $29,250. The defendant also has a 16.7% interest in Abbott Street, Inc. with has a 1% interest in Abbott Terrace. The 1% of the total distribution of $750,000 amounts to $7,500 and 16.7% of $7,500 is $1,252.50 for a combined budgeting income for the defendant's interests of $30,502.50.
 B. GLASTONBURY HEALTH CARE
The court finds the following facts regarding the defendant's investment in Glastonbury Health Care Center.
The defendant obtained an initial 2% interest in Glastonbury Health Care in 1993 for $20,000.
The United States Income Tax Return for Glastonbury Health Care Center for the fiscal year October 1, 1996 to September 30, 1997, shows that the defendant owns 28% of the stock in Glastonbury Health Care Center. All of the income and losses shown on the corporate tax return Kl for the defendant for the period of October 1, 1996 to September 30, 1997, was reported by the defendant on his personal 1996 income tax return as income and losses.
The joint 1996 income tax return of the plaintiff and defendant showed a deductible loss from Glastonbury Health Care Center of $14,589. The U.S. Corporate Tax Return for S Corporation for Glastonbury Health Care Center for the period of October 1, 1997 through September 30, 1998 shows the defendant's percentage of share of stock as 8.553425%. That tax return also shows JMJ Trust as owning 19.446575% of the shares of stock in Glastonbury Health Care Center. Despite the fact that the defendant had transferred to JMJ Trust 19.4446575% of the shares of stock that were held in his name in Glastonbury Health Care Center, he still declared on the joint income tax return for the calendar year 1997 filed by the plaintiff and the defendant all of the income from Glastonbury Health Care Center in the amount of $2,156 and all of the loss from Glastonbury Health Care Center in the amount of $2,151 that was attributable in part CT Page 10313 to the 19.4446575 percentage transferred to JMJ Trust. Due to the interest that the defendant's mother had in JMJ Trust the transfer by the defendant of the 19.4446575% of the shares of stock that he owned in Glastonbury Health Care Center resulted in his mother owning the 19.4446575% interest in Glastonbury Health Care Center.
The U.S. Income Tax Return for Glastonbury Health Care Center, Inc. for the period of October 1, 1998 through September 30, 1999 shows the defendant owning 2% of the shares of stock of Glastonbury Health Care Center, Inc., and JMJ Trust owning 26%.
The defendant claims that he obtained $97,500 from his mother in 1995 to purchase on her behalf a 26% interest in Glastonbury Health Care Center, Inc., and that he used those funds to obtain the additional 26% interest that he acquired. At 2% the value of the defendant's interest in Glastonbury Health Care Center, Inc., would be $105,533. At 28% his interest would have been $1,477,255. If, in fact, he was not holding 26% of the shares of Glastonbury Health Care Center, Inc., in trust for his mother then in transferring the 26% of the shares to her (1,300 shares) by transferring those shares to JMJ Trust he transferred assets worth $1,371,722 to cancel an indebtedness of $97,500. The defendant points to a number of exhibits in arguing that the funds to acquire the shares of stock in Glastonbury Health Care Center, Inc., which he acquired in 1996 came from his mother. Defendant Exhibit 32 is a People's Bank account in the name of the defendant's mother and father for the period of April 19, 1995 through May 16, 1995 showing a current balance of $60,478.31. The account balance for the period ending June 19, 1995 was $60,657.30. The account balance for the period ending July 18, 1995 was $60,830.29. Another bank account in the name of the defendant's mother and father at Chase Manhattan Bank shows a balance as of August 31, 1995 of $61,423.60.
A "negative pledge agreement" was entered into between the defendant and his mother on January 5, 1996. That agreement refers to the fact that the defendant is the owner of 2000 shares of common stock in Glastonbury Health Care Center, Inc., and that he had previously pledged the stock to Meditrust Mortgage Investments, Inc., as partial security for a loan made by Meditrust to Glastonbury Health Care Center, Inc. The negative pledge agreement refers to the defendant as the pledgor and refers to his mother as the lender. The negative pledge agreement also provides in part as follows:
WHEREAS, the Pledgor wishes to borrow the amount of Ninety-seven CT Page 10314 thousand five hundred dollars ($97,500) (the "Loan") from Lender upon the terms set forth in a certain promissory note of even date herewith made by the Pledgor to the order of the Lender (the "Note") . . . [Emphasis provided.]
The defendant, his mother, his brother and his sister entered into an amendment to the JMJ Trust. The amendment purports to be dated January 1, 1998 but was executed on August 30, 1999. The amendment provides as follows:
 WITNESSETH:
WHEREAS, the Grantors desire to amend the JMJ Trust Indenture to memorialize a deposit of property made by the said Grantor, Janet W. Errichetti, to be added to her separate trust; NOW, THEREFORE, the Trustees agree as follows: As of January 1, 1998, the said CHRISTOPHER ERRICHETTI and the said JANET W. ERRICHETTI have agreed that CHRISTOPHER ERRICHETTI shall cause thirteen hundred (1300) shares owned by him in GLASTONBURY HEALTH CARE CENTER, INC. to be transferred to the JMJ Trustin exchange for cancellation of certain indebtedness in the principalamount of $97,500 owed by him to JANET W. ERRICHETTI, such shares to be added to JANET W. ERRICHETTI's separate trust. [Emphasis provided.]
Both the negative pledge agreement and the amendment to the JMJ Trust refers to the transaction between the defendant and his mother as one of a loan rather than as one in which the defendant is holding shares of stock on behalf of his mother.
A joint income tax return for the calendar year 1998 was filed by the defendant. The plaintiff did not sign that tax return. That tax return shows that the shares of stock in Glastonbury Health Care, Inc. that the defendant acquired on December 28, 1995, were sold by him on February 1, 1998, for $97,500. It reflects a cost of other basis plus improvement and expense of sale of $94,619 and a gain of $2,881. The February 1, 1998 sale in question reflects the transfer by the defendant of the 26% of the shares of stock that were in his name in Glastonbury Health Care, Inc. to JMJ Trust.
The exhibits that have been submitted reflect conflicting dates as to when the defendant transferred the 26% interest in Glastonbury Health Care, Inc. during the calendar year 1998 to JMJ Trust. The joint income tax returned filed by the plaintiff and the defendant states the transfer took place on February 1, 1998. The Glastonbury Health Care Center, Inc. Federal Income Tax Returns report that the defendant owned 28% of the CT Page 10315 shares of stock for the period of October 1, 1997 to September 30, 1997 and 2% of the shares of stock for the period of January 1, 1998 to September 30, 1998 with JMJ Trust owning 26% of the shares of stock totaling 1, 300 shares for the period of January 1, 1998 to September 30, 1998. The amendment to the JMJ Trust executed on August 30, 1999, states that as of January 1, 1998, the defendant and his mother had agreed that the defendant would cause 1, 300 shares owned by him (26%) in Glastonbury Health Care Center Inc. to be transferred to JMJ Trust in exchange for cancellation of certain indebtedness in the principal amount of $97,500 owed by him to his mother. From all the evidence presented, the court finds that the transfer of the 26% of shares of stock in Glastonbury Health Care Center, Inc. by the defendant to JMJ Trust took place on February 1, 1998.
While this court is satisfied that the defendant did obtain money from his mother and that he used $97,500 of those funds to acquire 26% of the shares of stock in Glastonbury Health Care Center, Inc., this court further finds that the $97,500 was a loan from the defendant's mother to the defendant and that there is no credible evidence that the $97,500 was turned over to the defendant by his mother for the purpose of the defendant acquiring 26% of the shares of stock in Glastonbury Health Care Center, Inc. on behalf of his mother.
The defendant prepared a balance sheet as of November 12, 1996, showing various assets that he owned as of November 12, 1996. That balance sheet reflects that the defendant owned a 28% interest in Glastonbury Health Care. The balance sheet did not reflect that any of the 28% interest was held by the defendant for his mother.
The defendant further argues that if he still held the full 28% interest in Glastonbury Health Care Center, Inc. at the present time that his mother would have a resulting trust for the 26% interest in dispute.
The court is not persuaded by that argument.
In Farrah v. Farrah, 187 Conn. 495, 500-01 (1982), the court stated in part as follows:
 The law on resulting trusts in Connecticut is well settled. Resulting trusts arise by operation of law at the time of a conveyance when the purchase money for property is paid by one party and the legal title is taken in the name of another. . . . Because a trust will result only in the party who pays the purchase price at the time of the conveyance, the party seeking to establish CT Page 10316 the trust has the burden of proving the facts necessary to raise a resulting trust, including the fact that he paid the purchase price.
In this case the defendant's mother did not pay the purchase price for the 26% interest for the shares of stock in question but rather loaned funds to the defendant which loan the defendant used to purchase the 26% interest in shares of stock in Glastonbury Health Care Center, Inc.
For the fiscal year ending September 30, 2001, Glastonbury Health Care Center has budgeted distributions of income amounting to $10,000 for a 2% interest and $130,000 for 26% interest. The court finds that the defendant has voluntarily reduced his income in Glastonbury Health Care Inc. by transferring to his mother a 26% interest in that asset. The court is also considering in entering property orders under the provisions of 46b-81
(c) regarding preservation of assets the fact that the defendant transferred to his mother an asset with a value of $1,371,722 to cancel an indebtedness of $97,500.
 C. LITCHFIELD WOODS (Highland View)
The total fair market value of this asset is $19,150,000 and it has an equity of $10,509,406. The total interest of the defendant in this asset amounts to $543,022. His interest consists of a 5% interest in Litchfield Woods together with a 16.7% interest in Roberts Street, Inc. which has a 1% interest in the home. His 5% interest has a value of $525,470 and the interest that he has through Roberts Street, Inc. amounts to $17,551. For the calendar year ending September 30, 2001, the 5% interest that the defendant owns in Litchfield Woods has a budgeted cash distribution of $32,000. The total budgeted distribution for this asset for the fiscal year ending September 30, 2001, is $640,000. The 1% interest that Roberts Street, Inc. has in the $640,000 distribution amounts to $6,400. The defendant's 16.7% interest in that $6,400 amounts to $1,068.88 rounded off to $1,069. The combined interest that the defendant has in the fiscal year ending September 30, 2001 distribution amounts to $33,069.
 D. BARNETT MULTI-HEALTH A/K/A NORTHBRIDGE
The total fair market value of this asset is $10,000,000. Its net equity is $1,400,295. The defendant's interest in this asset through JMJ Trust amounts to $70,995. The defendant has a 13% beneficial interest in the JMJ Trust which has a 39% interest in this home. For the fiscal year ending September 30, 2001, Northridge has total budgeted distributions of $350,000. The 39% interest that JMJ Trust has in that distribution CT Page 10317 amounts to $136,500. The defendant's 13% interest in that distribution amounts to $17,745.
 E. SHERWOOD WOODS
The total fair market value of this asset is $9,550,000. Its net equity is $3,687,660. The defendant's 2% interest in this asset has a value of $73,753. The budgeted distribution for Sherwood Woods for the fiscal year ending September 30, 2001, is $320,000. The 2% interest that the defendant has in this distribution amounts to $6,400.
 F. WADSWORTH GLEN
The total fair market value of this asset is $9,000,000. It has an equity of $4,329,207. The defendant has a 16.7% interest in Boston Road, Inc. which has a 1% interest in the home worth with the defendant's interest being $7,229 and the defendant has a 5% interest in the amount with a value of $216,460. The defendant's combined interest in this asset amounts to $223,689. The budgeted distribution for this asset for the fiscal year ending September 30, 2001, is $300,000. The 1% interest that Boston Road, Inc. holds amounts to $3,000 with the defendant's 16.7% interest in that amount totaling $501. The 5% interest that the defendant holds in the $300,000 distribution amounts to $15,000 which results in a total interest in the distribution of $15,501.
 II. Real Estate Interest
The real estate interest come under the categories of buildings and land holdings as well as real estate assets under contract for sale.
A. Buildings and lands interests consist of the following:
1. 835 West Queen Street Office Building
2. Watertown ALSA, LLC — Land
3. Knotter, LLC — Land
4. Country Club Estates, LLC — Land
5. Exchange Place — Highrise Building
6. Errichetti Development Group CT Page 10318
7. Waterbury Terraces, LLC
 1. 835 WEST QUEEN STREET OFFICE BUILDING
The fair market value of this asset is $360,000. It has an equity of $34,010. The defendant's 20% interest in this asset amounts to $6,802.
 2. WATERTOWN ALSA, LLC
This asset consists of vacant land. It has a fair market value of $495,000. It does not have any mortgages or other encumbrances. The defendant is the sole owner of Watertown ALSA, LLC.
The defendant does not hold any of his interest on behalf of his brother.
 3. KNOTTER, LLC
Knotter Associates, LLC acquired an 8.46 Acre parcel of land on June 23, 1998, from Webster Bank on the easterly side of Knotter Drive in the town of the Southington, State of Connecticut. Knotter Associates, LLC obtained title to a 16.8 Acre parcel of land from the State of Connecticut, Department of Transportation on February 8, 1999. The parties are in dispute as to the value of those parcels of land as well as to the interest the defendant has in Knotter Associates, LLC.
The defendant makes the following argument regarding the extent of his interest in Knotter, LLC and the value of that interest.
 The parties are in disagreement over the extent of the defendant's interest in this asset, and its value. In some respects, this may be the most complex of the real estate assets.
 The plaintiff's position is that the defendant has an interest in 24.18 acres, which have an overall value of $1,450,000. The defendant disagrees with the extent of the property in which he has any interest and with the valuation by the plaintiff's expert.
 The defendant testified that he is the sole nominal owner of an entity known as Knotter, LLC. He asserts that his brother has a 50% in this LLC, as the funds invested in the real estate came from the Value Health proceeds. He also testified that Knotter, LLC is a partner with an entity known as Knotter Partners, LLC, whose CT Page 10319 members are third parties not related to the plaintiff, and that the two entities are the members of a third entity known as Knotter Associates, LLC. He further testified that the entity known as Knotter Associates, LLC purchased a parcel of land, consisting of 8.46 acres in June, 1998. This is the parcel identified on Plaintiff's Exhibit 36. The defendant also testified that in February, 1999, a group consisting of Knotter Partners, LLC (which does not include the plaintiff (nee the defendant) or his entity, Knotter, LLC) and other persons purchased a contiguous parcel of 16.8 acres. See, Plaintiff's Exhibit 35. For reasons unknown to the plaintiff (nee defendant), as he had nothing to do with the matter, that new group took title to the second parcel in the name of Knotter Associates, LLC also. It is also important to note that there was no evidence that any funds came from the defendant for the purchase of the second parcel. Thus, although it would appear from the deeds that the same entity holds the full 24 acres, it is also clear that Knotter, LLC (the defendant's entity) only has interests in the initial 8 acres. While it might be said that Knotter, LLC has a 1/6th interest in all of the property held by Knotter Associates, LLC, that would not be accurate, for if the 16.8-acre piece were to be sold apart from the 8-acre piece, Knotter, LLC would not share in the proceeds. In light of the fact that the 16-acre parcel straddles the Cheshire/Southington line, while the 8 acres are in Southington, such a separate sale is possible.
 The defendant submits that his testimony about this complex titling of the asset is credible, and, therefore, the court should conclude that his interests attached only to the 8-acre parcel.
The court agrees with the defendant's argument regarding ownership of the 8.46 acre parcel and the 16.8 acre parcel. The defendant is the sole owner of Knotter, LLC having acquired that asset from funds that he received from the Value Health Care proceeds. As found earlier his brother does not have any interest in Knotter, LLC. Knotter, LLC is a partner with an entity known as Knotter Partners, LLC. The defendant does not have any ownership interest in Knotter Partners, LLC. On June 23, 1998, Knotter Associates, LLC, purchased from the State of Connecticut a parcel of land located in Southington, Connecticut described as containing 8.46 acres. The members of Knotter Partners, LLC are third parties and not related to the defendant. Knotter, LLC and Knotter Partners, LLC are members of Knotter Associates, LLC. Knotter, LLC holds a 50% interest in the 8.46 acres owned by Knotter Associates, LLC. That parcel has a fair CT Page 10320 market value of $60,000 per acre or a total value of $507,600 with the defendant's interest in that parcel held through Knotter, LLC amounting to $253,800. The second parcel in dispute is a 16.8 acre tract of land situated partially in Southington and partially in Cheshire that was obtained by quitclaim deed from the State of Connecticut dated February 8, 1999. The quit-claim deed states that the grantee is Knotter Associates, LLC. The court finds that the total fair market value of that tract of land is $1,008,000. The defendant did not contribute any sum of money towards the $228,000 purchase price of the 16.8 acre tract of land. The court finds that the defendant does not have any interest in the 16.8 acre tract of land.
 4. COUNTRY CLUB ESTATES, LLC. — LAND
The defendant has a 50% interest in Country Club Estates, LLC. He does not hold any part of that interest for his brother. Country Club Estates, LLC obtained title to tracts of land located at 1953 and 2037 Highland Avenue, Cheshire, Connecticut from Connecticut Center, Inc. by deed dated June 30, 1997 for $300,000. Schedule A to the deed describes four separate parcels of land. The first parcel contains 17.3 acres of land. The second parcel contains 3.3 acres of land. The third parcel contains 0.746 of an acre of land. Those three parcels combined total 21.346 acres. The fourth parcel contains 2.827 acres of land. The total amount of land of all four parcels is 24.173 acres. The court finds that the fair market value per acre is $100,000 for a total fair market value of $2,417,300. The defendant's one-half interest amounts to $1,208,650.
 5. EXCHANGE PLACE — HIGHRISE BUILDING
Exchange Associates Limited Partnership owns a two office condominium building located in downtown Waterbury. The court finds that the fair market value of this property is $2,000,000. That it has a mortgage with a balance of approximately $1,000,000 and — an equity of approximately $1,000,000. The defendant's interest in this property is one-half of .65% or $3,250.
 6. ERRICHETTI DEVELOPMENT GROUP
The defendant's interest in this asset is one-third of one quarter percent or $833.
 7. WATERBURY TERRACES, LLC
A contract was entered into on August 2, 2000, for the sale of this CT Page 10321 asset for $700,000. In approximately October of 2000, the buyer elected not to complete the purchase. The same buyer for this property is the buyer for the Phoenix Land, LLC, asset. The contract for sale for this parcel of land calls for a penalty in the event the buyer does not complete the sale of $100,000 to be added to the purchase price of the Phoenix Land, LLC, asset. The court finds that the fair market value for this asset is $420,000 and that the defendant holds a 60% interest in this asset amounting to $252,000. The court further finds that the defendant does not hold any part of his 60% interest on behalf of his brother.
B. Real Estate assets under contract for sale consist of the following:
a. Phoenix Land, LLC — Land
b. Sixth Floor, LLC — Office Condo Unit
 a. PHOENIX LAND, LLC — LAND
The defendant holds a 3/7th's interest (approximately 43%) in this entity. The defendant does not hold any part of that approximate 43% interest for his brother.
The purchaser of this property is the same purchaser that was to purchase the property known as Waterbury Terraces, LLC. Under the contract for sale for Waterbury Terraces, LLC (PLAINTIFF'S 17) $100,000 is to be added to the purchase price of Phoenix Land, LLC in the event the buyer does not complete the purchase of Waterbury Terraces, LLC. The buyer did not complete the purchase of Waterbury Terraces, LLC and therefore an additional $100,000 is to be paid for Phoenix Land, LLC, thereby increasing the sale price from $3,400,000 to $3,500,000. The $3,500,000 is to be allocated as follows:
 a. By payment to the defendant's mother approximately $600,000 to pay off a loan that she made;
b. By payment to the defendant of $300,000 for capital he invested;
 c. By payment to Robert Nocera of $72,000 for capital that he invested;
 d. By payment to Jack Nocera of $72,000 for capital that he invested. CT Page 10322
Those payments reduce the net amount available for distribution to $2,456,000. There are miscellaneous costs and expenses of approximately $56,000 thereby reducing the net amount available for distribution to $2,400,000.
The defendant owns a 3/7th interest in Phoenix Land, LLC and he therefore will receive 3/7th's of $2,400,000 or approximately $1,028,571 plus the $300,000 return of capital for a total of approximately $1,328,571. The court therefore finds that the defendant's interest in Phoenix Land, LLC has a fair market value of $1,328.571.
 b. SIXTH FLOOR, LLC — OFFICE CONDO UNIT
This asset has been sold and by agreement of the parties, the defendant's attorney was holding the net proceeds of $75,899.16 in escrow pending further order of the Court.
By agreement of the parties and order of the court the balance of the fee owed to Attorney Conway of $4,772.50 and the balance of the fee owed to Attorney Snearly of $19,058.93 has been paid in full from this account leaving a balance of $52,067.73.
The defendant's attorney is holding the balance of $52,067.73 pending further order of the court.
III. Other Interests consist of the following:
1. Settler's Group
The defendant established Settler's Group, LLC. He holds a one-third interest in it. Settler's Group, LLC holds varying interests in seven residential projects with a total combined net value of $170,000 and the defendant's interest amounting to $56,667. In addition, the defendant holds a 34% interest in four other development related entities which have no value consisting of CJR Builders, LLC, CJR Developers, LLC, Flanders East, LLC, and Highwood G.P., LLC.
2. Heritage Commons
The defendant has a 10% interest in Boston Road Associates, LP, which operates Heritage Commons. This interest has no value.
3. Emerald Coast, LLC CT Page 10323
The assets of Emerald Coast, LLC consist of cash and contracts that it holds to buy condominium units. The defendant established Emerald Coast, LLC in 1998 for the purpose of buying condominium units. The defendant holds a 25% interest in Emerald Coast, LLC. The condominium units are located in Destin, Florida. He contributed approximately $49,000 to Emerald Coast, LLC in 1998 and 1999. The remaining partners contributed $150,000. The cash assets of Emerald Coast, LLC amount to $234,593 of which the defendant owns 25% or $58,648.
4. North Elm Associates LP
This entity was formed in 1980. It has approximately $1,000 in the bank and the defendant is a 99% limited partner. The court finds that his interest has a value of approximately $900.
5. R C Developers Inc.
R C Developers, Inc. has between $1,000 and $5,000 in a bank account. The court finds that the defendant's interest in R C Developers is $3,000.
6. Cobalt Construction, LLC.
Cobalt Construction, LLC is a limited liability company that has handled some general contracts. The defendant's interest in this entity has a value of $48,328.
The family home located at 392 Charcoal Avenue, Middlebury, Connecticut was purchased by the defendant before he met the plaintiff. It is part of an Errichetti Family Compound that the defendant's father put together in Middlebury, Connecticut. The defendant's brother as well as his parents reside in that compound. The defendant purchased the home in 1987 from an estate for $385,000. He paid $85,000 cash and financed the balance by a mortgage. By the start of 1990 the mortgage balance was approximately $100,000. The home was transferred to the plaintiff in approximately 1991 due to the fact that the defendant was about to embark on some risky business ventures. The title to the family home was placed in a trust in 1997 and 1998 for estate tax purposes. The plaintiff has a thirty year interest in that trust. The parties have stipulated that the fair market value of her remaining interest is $227,080.
The plaintiff makes the following argument regarding the defendant's income to the extent such income relates to alimony orders, property CT Page 10324 orders, and support orders:
 As indicated by the parties' Federal income tax returns, the adjusted gross income of the defendant in the year 1997 was $2,718,325 (See plaintiff's exhibit no. 4) and $771,892 in the year 1998 (See plaintiff's exhibit no. 5). This income was produced by multiple investments and/or projects in which the defendant participated. . . . It is the contention of the plaintiff that the defendant had the ability to generate income substantially in excess of the unearned income shown on the defendant's 1999 Federal income tax return and November 6, 2000 financial affidavit. This position is supported by the very substantial income generated by the defendant in the years 1997 and 1998. . . . The defendant contends that his income for the years 1997 and 1998 is no index of his earning capacity inasmuch as this income originated from projects and investments. However, that is exactly the type of work in which the defendant has intentionally engaged since 1994. Although such income may not be in the form of a consistent weekly paycheck, it must be recognized. To argue that returns on investments should not be includable as income is ridiculous given the nature of the business in which the defendant engages.
The court is not persuaded by that argument.
In the calendar year 1997, the defendant reported gross receipts from his legal profession of $113,900 and a net profit of $105,420. Most of that income consisted of a one-time director fee that he received from Value Health of $80,000. He also received a fee $26,400 from Athena Health Care Systems, Inc. In the calendar year 1997 the plaintiff had W2 wages from the City of Waterbury $26,834. The total gross income of the parties for the calendar year 1997, was $2,723,792. of that amount $2,234,473 was from the sale of his interest in Value Health Care.
In the calendar year 1998, the plaintiff had W2 wages from the City of Waterbury of $28. The defendant reported on the 1998 income tax return total legal fees of $26,400 and net taxable legal fee income of $21,506. The $26,400 was a director's fee for serving as a director on Athena Health Care. The total combined adjusted gross income of the parties for the calendar year 1998, was $771,892. of that amount $295,214 was from long term capital gains regarding R C Developers, Inc. and Value Health Care Service, Inc. There was also a gain of $199,954 from the sale of an interest in Athena Comm. The court finds that for the purpose of entering alimony, support and property orders that the defendant's gross annual income consists of the following: a. Athena Health Care Associates, CT Page 10325 Director Fee $26,400; b. Glastonbury Health Care Center Inc., $130,000; c. Litchfield Woods, $33,069; and d. Wadsworth Glenn, $15,501 for a gross annual income of $204,970 or a gross weekly income of $3,942. The court also finds that as a result of the orders hereinafter entered that the plaintiff has gross annual income consisting of the following: a. Glastonbury Health Care, Inc., $10,000; b. Abbott Terrace of $30,503; c. Sheridan Woods, $6,400; and d. Barnett Multi-Health, $17,445 for a gross annual income of $64,348 or a gross weekly income of $1,237.
Part of the defendant's income is from his position as a director of Athena Health Care. Athena Health Care manages the various nursing homes shown on his financial affidavit. It provides supervisory care to the nursing homes. Approximately 42% of the ownership of Athena Health Care is in the defendant's father and approximately 12% or 13% in Larry Santelli. His father and Larry Santelli set the director's fees.
The parties entered into a stipulation dated March 12, 2001, captioned "Stipulation". Counsel for the minor child Amy Errichetti agrees with the stipulation except as to paragraphs 10 and 11. In view of the fact that this court has assigned to the defendant all of his interest in Wadsworth Glenn and Litchfield Woods, the objection by counsel for the minor child is moot. The stipulation of March 12, 2001, also addressed the issue of health insurance. The parties further have Stipulated in open court that the cost for health insurance for the defendant for himself and the three children, exclusive of dental coverage, through the reinsurance pool will be $600 per month. Further, the plaintiff has applied for health insurance through Anthem Blue Cross. If approved her cost for herself only will be $212 per month. If she has to obtain health insurance through the reinsurance pool then her costs would be $417 per month for the health insurance only. Her cost for dental insurance if approved through Continental Dental will be $43.12 per month. All of the facts found in the stipulation dated March 12, 2001, are made facts under this decision. A copy of that stipulation is also attached to this memorandum of decision.
The plaintiff's motion for contempt is denied.
This court has considered the provisions of § 46b-82 regarding the issue of alimony, and has considered the provisions of § 46b-81 (c) regarding the issue of property orders, and has considered the provisions of § 46b-84 and the Child Support Guidelines regarding the issue of support, and has considered the provisions § 46b-56 regarding the issue of custody and visitation and has considered the provisions of § 46b-62 regarding the issue of attorneys' fees. The court enters the CT Page 10326 following orders:
 ORDERS
A. BY WAY OF DISSOLUTION OF MARRIAGE
1. The marriage between the parties is dissolved and each party is declared to be single and unmarried.
B. BY WAY OF ALIMONY
1. The defendant is ordered to pay to the plaintiff alimony in the amount of $1,000 weekly.
2. Alimony is to terminate upon the earliest of the following events: a. the death of the plaintiff; b. the death of the defendant; c. the remarriage of the plaintiff; or d. July 16, 2013. The minor child, Daniel Errichetti, will turn 18 on July 16, 2012. The court finds that it is in the children's best interests that the plaintiff not be required to seek employment prior to the time all of the children turn 18. The court is extending the period of time for the termination of alimony by one year in order to account for any problem that the plaintiff may incur in obtaining employment. Commencing July 16, 2012, and monthly thereafter she is to provide to the defendant written notice regarding the attempts that she is making to obtain employment. The length of alimony cannot be extended beyond July 16, 2013.
3. The provisions of § 46b-86 (a) and 46b-86 (b) are applicable.
4. The defendant is ordered to name the plaintiff as beneficiary in the amount of $100,000 regarding his $500,000 life insurance policy. This obligation terminates when his obligation to pay alimony terminates and is also subject to the provisions of § 46b-86 (a) and 46b-86 (b).
C. BY WAY OF CUSTODY AND VISITATION
1. The parties entered into a stipulation dated November 7, 2000, captioned "Stipulation re: Custody and Parenting Plan for Minor Children Christopher and Daniel Errichetti". The court approves of that stipulation and enters orders in accordance with that stipulation. The parties entered into a second stipulation dated November 7, 2000, captioned "Minor Child's Stipulated Agreement". The court approves "of that stipulation and enters orders in accordance with that stipulation. The parties entered into a third stipulation dated January 11, 2001, CT Page 10327 captioned Stipulated Agreement re: Minor Children Vacation". The court approves of that stipulation and enters orders in accordance with that stipulation. All three stipulations are attached to this memorandum of decision.
D. BY WAY OF SUPPORT
1. The defendant is ordered to pay to the plaintiff support in the amount of $1,000 per week. He is also ordered to pay 43% of unreimbursed medical and qualifying day care costs.
2. The defendant is to maintain health insurance for the benefit of the minor children. The term "medical" and "health" includes dental insurance.
3. The defendant is ordered to name each minor child as a beneficiary in the amount of $100,000 regarding the $500,000 life insurance policy that he presently has on his life. The obligation to name each child terminates when the obligation to pay support for each child terminates. This obligation is subject to the provisions of § 46b-86 (a). By way of illustration, when the obligation to support the oldest child, Amy Marie Errichetti, terminates then the defendant only has to name each of the two younger children as beneficiary in the amount of $100,000 each.
4. The defendant has the right to claim the two youngest children as deductions for federal and state income tax purposes for each calendar year he is current in his alimony and support payments at the end of such calendar year. This provision may be modified in the event the alimony and/or support order is modified.
E. BY WAY OF PROPERTY ORDERS
1. The defendant is to pay the liabilities shown on his financial affidavit and hold the plaintiff harmless therefrom.
2. The 1996 Jimmy shown on his financial affidavit with a value of $13,530 and no loan balance is awarded to the defendant.
3. All household furnishings in the defendant's possession are awarded to the defendant.
4. All of the bank accounts shown on his financial affidavit are awarded to the defendant. CT Page 10328
5. The defendant's interest in his Etrade stock including the $5,740 cash and his Pershing account and his Schwab are ordered divided 50% to the plaintiff and 50% to the defendant. The 50% to the plaintiff is to be based on both fair market value and basis.
6. All of the defendant's interest in his IRA through the Equitable is awarded to the Defendant.
7. All liabilities shown on the plaintiff's financial affidavit are to be paid by the plaintiff and she is to hold the defendant harmless therefrom, except for federal and state income taxes for the calendar year 2000.
8. The 1999 Dodge shown on her financial affidavit is awarded to the plaintiff.
9. The 1990 Jeep shown on her financial affidavit is awarded to the plaintiff.
10. All furniture, furnishings and miscellaneous personal property in the possession of the plaintiff are awarded to the plaintiff.
11. The bank accounts shown on the plaintiff's financial affidavit are awarded to the plaintiff.
12. The Linsco Account shown on the plaintiff's financial affidavit is awarded to the plaintiff.
13. The State of Connecticut Teacher's Retirement System Retirement Plan shown on the plaintiff's financial affidavit is awarded to the plaintiff.
14. The defendant is to hold the plaintiff harmless regarding any federal and state income tax liability that the plaintiff may have for the calendar year 2000.
15. All of the plaintiff's interest in the Margaret M. Errichetti Qualified Personal Residence Trust is awarded to the plaintiff. The defendant is not given the right of first refusal in the event that home is sold.
16. All of the plaintiff's interest in the Irrevocable Trust Agreement established by John D. Mahaney, Sr. and Alan C. Mahaney for CT Page 10329 property located at Cape Cod, Massachusetts is awarded to the plaintiff.
17. The balance held in escrow by Attorney Louis I. Parley in the amount of $52,067.73 is awarded to the plaintiff.
18. All of the defendant's interest in the following nursing homes are awarded to the defendant: a. Litchfield Woods; and b. Wadsworth Glenn. The court awards to the defendant all of his interest in the additional following assets: a. 835 West Queen Street — Office Building; b. Country Club Estates — Land; c. Exchange Place — Highrise building; d. Errichetti Development Group; e. All of his interest in Settler's Group together with all of his interests in CJR Builders, LLC, CJR Developers, LLC, Flanders East, LLC, and Highwood GP, LLC.; f. all of his interest in Heritage Common; g. all of his interest in Emerald Coast, LLC; h. all of his interest in CRJ Realty, LP, North Elm Associates, LP, and R C Developers, Inc.; and i. all of his interest in Cobalt Construction.
19. All of the defendant's interest in Abbott Terrace consisting of a 16.7% interest in Abbott Street, Inc., which has a 1% interest in Abbott Terrace and his 13% interest in the JMJ Trust which has a 30% interest in Abbott Terrace are all awarded to the plaintiff.
20. All of the defendant's interest in Barnett MultiHealth aka Northbridge consisting of his 13% interest in the JMJ Trust which has a 39% interest in Barnett Multi-Health is awarded to the plaintiff.
21. All of the defendant's 2% interest in Sheriden Woods is awarded to the plaintiff.
22. All of the defendant's interest in Watertown ALSA, LLC is awarded to the plaintiff. The defendant is to hold the plaintiff harmless from any claims of his brother including the payment of reasonable attorney's fees incurred by the plaintiff in defending such claim.
23. The court awards to the plaintiff all of the defendant's interest in Knotter, LLC. The defendant is to hold the plaintiff harmless from any claims of his brother including the payment of reasonable attorney's fees incurred by the plaintiff in defending such claim.
24. The court awards to the plaintiff all of the defendant's interest in Waterbury Terraces, LLC. He is to hold the plaintiff harmless from any claims of his brother including the payment of reasonable attorney's fees incurred by the plaintiff in defending such claim. CT Page 10330
25. The court assigns to the plaintiff all of the defendant's interest in Phoenix Land, LLC. He is hold the plaintiff harmless from any claims of his brother including the payment of reasonable attorney's fees incurred by the plaintiff in defending such claim.
F. BY WAY OF ATTORNEYS' FEES AND OTHER EXPERT FEES
1. No attorneys' fees are awarded in favor of the plaintiff or the defendant.
2. No expert accountant fees are awarded in favor of the plaintiff or the defendant.
3. No expert attorney's fees regarding Attorney Donna D. Vincenti is awarded in favor of the plaintiff.
G. MISCELLANEOUS ORDERS
1. Counsel for the plaintiff is to prepare the judgment file within thirty days and send it to counsel for the defendant for signature who in turn is to send it counsel for the minor children for signature and filing.
2. The parties are to exchange copies of their federal and state income tax returns for so long as there is an outstanding support order and/or alimony order and/or any arrearage thereto.
3. Any arrearages under the pendente lite orders up to the date this decision is filed are not merged into the judgment and survive the judgment.
4. The plaintiff is responsible for the cost of her own health insurance and for any unreimbursed health insurance expenses.
5. Counsel for the plaintiff is to prepare the necessary documents for all of the transfers of assets from the defendant to the plaintiff. Said transfers are to be completed within thirty days from the date this decision is filed. The court retains jurisdiction over any disputes that may arise involving the language of such transfers.
6. The plaintiff is restored her maiden name of Margaret Mahaney. CT Page 10331
 ____________________ AXELROD, JUDGE